## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Docket No.: 1:21-CR-00608 (RCL) |
| | : | |
| v. | : | |
| | : | |
| JUSTIN McAULIFFE, | : | |
| | : | |
| *Defendant*. | : | |
| | : | |

## JUSTIN McAULIFFE'S SENTENCING MEMORANDUM

Defendant, Justin McAuliffe, by and through his undersigned counsel, respectfully submits this Memorandum in support of his sentencing pursuant to 18 U.S.C. § 3553(a).

### I.       Introduction

Justin McAuliffe was one of those who traveled to Washington, DC, for the political rally on January 6, 2021. After approximately 11 hours on the streets outside, he entered the United States Capitol non-violently but without permission through an open door and sat down in the first chair he saw. He rested, peacefully seated, until a Capitol Police Officer asked him and the others in the room to leave. He promptly did, exiting the building.

The tragic events that occurred in Washington on January 6th marked a low point for our democracy. They forever stain our nation. But the role that Mr. McAuliffe played in the terrible events of that day is overshadowed by the profound impact that the experience has had on himself, his family and his life. Mr. McAuliffe recognizes that his decision to enter the Capitol building was more than a disastrous lapse in judgment. It was a crime. He realizes this to the very core of his being. He feels shame and has expressed deep remorse. He and his family have

[Type here]

felt the adverse consequences of his conduct and will feel them for many years to come. But at the same time, for Mr. McAuliffe, the events and consequences of that day have provided an opportunity for profound self-reflection, personal growth, and, ultimately, a chance for reconciliation and redemption. In preparing for his pre-sentence interview with Probation, Mr. McAuliffe wrote an account of his experience – a true turning point in his life – which was submitted as his Statement of the Offender. It was intended by him and by undersigned counsel to serve as a letter to this Court expressing his insight and contrition. It speaks volumes about who Mr. McAuliffe is and about how much he has grown through this experience. His Statement, supported and augmented by the extraordinary number of character letters annexed hereto, depicts an exceptional human being who has evolved, over the past year, as a result of his participation in the tragic events of January 6th.

Mr. McAuliffe awaits sentencing before this Honorable Court on a single count of Parading, Demonstrating, or Picketing in a Capitol Building. He faces up to six (6) months of imprisonment, a fine of not more than $5,000, and a term of probation.

As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. The Government is recommending 14 days of incarceration along with a term of probation for three (3) years.[1] The Defense agrees that a term of probation is fully appropriate, but submits that a term of incarceration would derail Mr. McAuliffe's tremendous progress over the past year in rebuilding his marriage and his business and would do more harm than good to him and his family.

It is respectfully submitted that for the factors pursuant to 18 USC § 3553(a) set forth

---

[1] The Defense submits that a split sentence of probation and straight incarceration in a petty offense is legally impermissible under 18 U.S.C. § 3551(b) and § 3561 and will file a supplemental brief setting forth the reasons.

below and in the annexed materials made a part hereof, and in any separate related filings, that the appropriate sentence for Mr. McAuliffe is a term of probation with home detention and continued counseling, community service, and perhaps a heavy fine, but without incarceration. He is prepared to do any amount of community service the Court sees fit.

## II.        The Nature and Circumstances of the Offense

Without doubt, some of those who entered the U.S. Capitol on January 6, 2021, had violent intentions, and some were members of groups with a history of extremist involvement and anti-government views. But not everyone who came to Washington and ended up entering the Capitol fits that description. Those involved in the events fall upon a broad spectrum of both ideology and conduct. Some went to Washington to riot. But others went out of a sense of misguided patriotism, based upon the endlessly repeated narrative that the election had been stolen. Some who ultimately entered the building had absolutely no intention of doing so at the time that they had traveled to Washington. They initially went there to express support, but they were later caught up in the opportunity presented, in which good judgment was overcome.

The circumstances leading up to Mr. McAuliffe's journey to Washington, D.C., on January 5, 2021, and his terrible decision to enter an open door of the United States Capitol the following day, are detailed in his Statement included in Probation's Presentence Report (PSR), set forth in ¶¶ 35 through 59. It provides a robust account of what happened that day, beyond the short account of "Justin McAuliffe's Participation in the January 6, 2021, Capitol Riot" set forth in ¶¶ 16 through 19. His Statement is much longer than is typically submitted as a Defendant's Statement. However, consideration of it is crucial to understand not only how Mr. McAuliffe ended up in the Capitol building on January 6th, but how much he has changed due to his one year of self-reflection concerning his participation in the tragic events of that day. The factors

[Type here]

that made him so susceptible to the heated political debate of our time are set forth in PSR ¶¶ 38 and 39 and referenced in other portions of the PSR. Like so many Americans, Mr. McAuliffe got wrapped up in the vortex of the 2020 election's aftermath and bought into the conspiracy theories that were running rampant on social media. Suffice it to say, Mr. McAuliffe did not realize at the time how deeply he had succumbed to the corrosive pull of divisive social media, but he now sees that it was a significant factor that led him to Washington for the events of January 6.  His Statement in the PSR is so complete and thorough that the chronology of that day's events need not be reproduced here, beyond a few highlighted facts.

Of significance is the fact that Mr. McAuliffe's journey to Washington was intended purely for the purpose of expressing support. He had no specific plan as to what he would do there. He thought there might be an organized march up to the White House, which would be viewed by President Trump. It never even crossed his mind that the rally would escalate into the Capitol building. He was excited to be part of the historic show of support and was keen to document and share the experience on social media. It did not occur to him that the day would involve any criminal acts whatsoever.

Mr. McAuliffe entered the Capitol through an open door at 3 p.m., following many others who had already entered. At that time, there was no violence taking place at that door. He had been on his feet since before 4 a.m., walking around and taking video. He walked in and sat down in the first chair he saw, which was inside a conference room just off the hallway. Significantly, he proceeded no more than 30 feet into the building. He made no effort to go any further. He remained seated in the chair until a Capitol Police Officer asked him and the others in the room to leave, which promptly he did, exiting the building. He was only inside for about 30 minutes.

[Type here]

He did not force entry into the Capitol, he did not aggressively confront anyone inside, either physically or verbally, nor did he destroy or steal any property. In fact, he replaced a picture which had been taken off a wall by someone else. At no time did he attempt to make his way to the well of the Senate or House. He never went anywhere near the Capitol Rotunda. He was not associated with any of the groups reported in the media to have been responsible for certain aspects of what occurred that day.

On his way home, exhausted, he made a post to social media, with a few pictures, saying, "You're welcome" and that his mood was "feeling blessed." He never used any words of violence or the word "fight." Later that day, on the drive home, he heard on the radio the level of violence that occurred in other parts of the Capitol. It was only hours after, watching the news, that he became fully aware of the extent of the violence and intrusion inside the building. The news footage shocked and appalled him, far exceeding what he personally saw or remembered. He felt ashamed and sickened by much of what he saw.

These facts are not offered as excuses, or in any way to minimize his illegal conduct. On the contrary, he has expressed deep shame, remorse and contrition to everyone – it is reflected in all the character letters attached hereto, in the letters in the accompanying sealed filing, in his Statement to Probation, and in his interview with the Government about the case. My only purpose here is to contextualize Mr. McAuliffe's conduct in comparison with others who did engage in those more egregious activities, as the Government has focused on such factors for sentencing purposes. Again, Mr. McAuliffe fully accepts responsibility without any minimization and will be forever filled with shame and regret.

As a result of his conduct, Mr. McAuliffe entered a guilty plea and faces sentencing on a single count of Parading, Demonstrating, or Picketing in a Capitol Building. 40 U.S.C. §

[Type here]

5104(e)(2)(G). He faces up to six (6) months of imprisonment, a fine of not more than $5,000, and a term of probation. As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

**III.     The History and Characteristics of the Defendant**

Mr. McAuliffe is a married, self-employed Certified Public Accountant (CPA) on Long Island. He is 40 years old and has two children, aged 8 and 5 years. His accounting practice has served over two dozen small businesses spread all throughout the country. He not only assists them with their accounting and taxes but also advises them on business development. One of his primary responsibilities as a trusted CPA advisor is to coach his clients, helping them to hire more people (thus fostering post-lockdown/epidemic economic growth). To provide for his family when the accounting work is slow, he has supplemented his income as a driver for Lyft and Uber. He has many friends, clients and colleagues in the community who care about him deeply (as is reflected in the abundance of character letters attached hereto). He has no criminal record whatsoever.

Following the events of January 6, 2021, Mr. McAuliffe was interviewed by the Federal Bureau of Investigation. He voluntarily turned over all electronic devices requested of him. In fact, he was reportedly one of a minority of related cases who immediately not only turned over his cellphone, but gave a full consent to search and provided his PIN number. He also submitted to a full video interview with the assigned Assistant United States Attorney. By all accounts, he was honest, forthright, and extremely remorseful. According to conversations with the agents involved with his arrest, there was no active violence occurring at the entrance (Senate Wing doors) when Mr. McAuliffe approached and entered.

[Type here]

Since his arraignment on these charges, he has consistently met all the terms and conditions of his supervised release. Mr. McAuliffe has addressed certain mental health issues over the course of the past year in a deeply insightful and productive way. That aspect of mitigation will be submitted in a separate filing, under seal, as a supplement to this memorandum.

### A)  The Destructive Consequences of Mr. McAuliffe's Conduct

His conduct on January 6th has had life-altering effects. After the events at the Capitol his life was turned upside down. Media reports about his connection with the events of January 6th resulted in many clients severing their ties with him, including individuals, businesses and even organizations in which he held directorial positions. He lost partnerships in which he was an investor and was forced to dilute his interest in these companies. He lost speaking engagements that helped to promote his business. AirBnB no longer allowed him to use their platform. He was discharged as a Lyft driver. He got a letter from TSA Precheck canceling his enrollment in the program.

He was harassed on social media and received harassing emails and phone calls (see PSR ¶ 75). It became uncomfortable simply walking in his neighborhood. He started refraining from using his last name when placing food orders at local restaurants. Even members of his family were targets of harassment. More than anything else, he deeply regrets bringing all this upon his wife and family. They have suffered due to his actions and his actions alone. It is all his fault. He blames nobody but himself.

His marriage was already in trouble, for all the reasons set forth in the PSR ¶ 78. He was living in an apartment, no longer part of the cohabiting family unit since October of 2020. But what happened in Washington was the tipping point. The day after his arrest, his wife, whom he loves dearly, filed formal separation papers. It was another devastating blow. He takes full

[Type here]

responsibility for the struggles within his marriage. This could have been the end of Mr. McAuliffe's marriage and a story with a most unhappy ending. However, as will be seen below, it was not.

Mr. McAuliffe's participation in the events of January 6th have had more specific professional effects upon him due to his status as a licensed professional.  In addition to losing clients and jobs, not to mention the further erosion of his marriage, his professional licensing as a CPA presents another issue of deep concern – a criminal conviction, even for a misdemeanor, could provoke consequences that could end his professional career.  Attached hereto as **Exhibit A** is a letter from Thomas Manisero, Esq., of the law firm Wilson Elser. Mr. Manisero is an attorney who regularly practices in the area of accountant licensing.  He has years of experience with the Board of Regents and great familiarity with the New York State Education Law. His assessment letter explains what could happen to Mr. McAuliffe as a result of his guilty plea. It reads in pertinent part:

> "Based upon my experience of having represented many CPAs in connection with investigations and disciplinary proceedings with the Department for more than 25 years, I consider it highly likely that Mr. McAuliffe will face charges seeking revocation of his CPA license if he is convicted of or pleads guilty to a felony, and that he will face charges seeking suspension or revocation of his CPA license if he is convicted of or pleads guilty to a misdemeanor."

It is hoped that the licensing board will show the same mercy sought from this Court on Mr. McAuliffe, so that he can continue to provide for his family.

Mr. McAuliffe is filled with regret. He completely recognizes that his addictions to politics and the conspiracy theories that led to him to Washington were based on misinformation. He feels duped and misled by the information that drove him to Washington, and further realizes that he became part of events that got out of control.  Notably, part of his counseling (to be further detailed in a separate filing) includes a "commitment to not attend any political rallies or

[Type here]

events in the future." He is gladly adhering to that. He deleted his Facebook account shortly after the events and has since deactivated his Twitter account. He now only uses social media to promote his business and attract new clients. He finds that he is much happier.

In terms of both general and specific deterrence, the personal and reputational consequences Mr. McAuliffe brought upon himself outlined above are more than sufficient to discourage him from engaging in similar conduct. The adverse publicity invoked by the January 6th cases is itself significant general deterrence unlike any run of the mill federal misdemeanor case. A public Google search by name will be a permanent reminder to Mr. McAuliffe that some bad acts in life will never disappear. His name is forever stained. His actions since January 6, 2021, both in his cooperation with law enforcement and his extraordinary efforts toward redemption set forth below, cut against the possibility of recidivism.

### B) The Positive Changes in Mr. McAuliffe in the Past Year

Sometimes our worst decisions in life can be a catalyst for the kind of deep introspection that allows us to change and grow. Mr. McAuliffe has spent an enormous amount of time this past year looking back on the events of January 6th, 2021, and on everything that led him to go to Washington. Estranged from his wife and family, living alone in an apartment for several months, he came to understand that his gravitation and addiction to politics was an unhealthy substitution, bringing great pain to himself and his family. He has put exceptional effort into becoming the best version of himself that he can be – for himself, for his wife, and for his children. Even the process of writing his Statement contained in the PSR was an important opportunity for growth and closure for Mr. McAuliffe. It is a testament to the impact that this experience has had on him, and the maturity with which he takes full responsibility for his actions and looks back on all that transpired. It is truly quite exceptional and speaks volumes

about who Mr. McAuliffe is and how much he has changed and grown through this unfortunate experience.

A separate filing to be offered under seal, including but not limited to materials from Cindy Zabinski, LMHC, CRC, ACS, and Diane L. Gordon, R-LCSW, is an important testament to Mr. McAuliffe's outstanding progress and dedication to self-growth. It demonstrates powerful support for his levels of both insight and remorse. It is an important supplement to this memorandum, specific to mental health.

The deep level of self-reflection he has undertaken is demonstrated not only in his Statement of the Offense to Probation, but in so many of the character letters of support attached hereto. Collectively attached hereto as **Exhibit B** are letters as follows:

1- Steven Hirsch, CPA
2- Christian Campo
3- Matthew Terranova
4- John Savage
5- Joshua Jenson
6- Richard Fascianella
7- Ryan Johnston
8- Carolyn Kersch, Esq.
9- Erin Gardner
10- Andrew Carrick, CPA
11- Kristen Panoiu
12- Daulton O'Neill
13- Hansford Boutchyard
14- Salvatore Tringali
15- Mark Wolf
16- Kathleen McAuliffe
17- Joanna McAuliffe
18- Scott Edvabsky
19- William Baylis
20- Jason Wissel
21- Kevin Hopkins
22- Nathan Weise
23- Rajeesh Tiwary
24- Sharon McAuliffe
25- Tim Jipping

[Type here]

The Government exercised noteworthy due diligence by reaching out by telephone to most if not all the witnesses whose letters were supplied by the Defense. It is our belief that the Government was highly impressed by the above-and-beyond, virtually unprecedented level of support for Mr. McAuliffe expressed by so many of those who know him.

The past year has been transformative for Mr. McAuliffe. Its dark and stressful nature has been an opportunity for resurrection and rebirth. He has rebuilt his business this past year, reestablishing trust in his accounting clients. The crumbling marriage that had begun before January 6th but had been nearly destroyed by it is now in the process of being mended (see PSR ¶¶ 83 and 84). For the first time in years, both Mr. McAuliffe and his wife look upon their marriage with hope. His wife has accepted a new position in Arizona, to begin on January 18th, 2022. Rather than being the nail in the coffin of their marriage, as might have been expected, this is the chance to bring the healing process to a greater level. Mr. McAuliffe and his wife have rented a house in which they will return to living with their children, together as a family. Until the children finish the school year in June, Mr. McAuliffe will be "single parenting" here on Long Island while his wife is in Arizona starting her new position.  He will be solely and exclusively responsible for both children. He will get them up and dressed in the morning, prepare their lunches, and drop them at school. He will pick them up after school, prepare dinner, and help with homework and bathing. His son plays deck hockey and attends religious education, and may play soccer or baseball in the spring, schedule permitted. His daughter is in Girl Scouts and takes dance classes and swim lessons. These extraordinary family circumstances, in combination with the many other factors presented, mitigate against any custodial sentence.

When school finishes in June, Mr. McAuliffe and the children will fly to Arizona where they will rejoin his wife and embark on a new family life in a new part of the country. This is a

story of hope and redemption. It is a lesson that even the most tragic and difficult things in life can be a catalyst to make ourselves better, and even to rekindle relationships that we almost lost. (The photo below is from his son's 8th birthday party, a month ago.)



[Type here]

IV.     **The Need to Avoid Unwarranted Sentencing Disparities**

The Government has charged hundreds of individuals for their roles in the events of January 6th, and each offender must be sentenced based on individual circumstances but with the backdrop of the events in mind.  Indeed, this very Court has admonished that it did not "want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13. This Court is very aware that incarceration sentences can be appropriate, especially where a defendant attempts to deflect, deny or minimize his culpability in the events of January 6th. *See, United States v. Frank Scavo*, 1:21-CR-00254 (RCL). However, Mr. McAuliffe is in no way minimizing his wrong-doing and has accepted an exceptional level of responsibility as demonstrated by all his efforts over the past year to address all the circumstances that led to that day (*see*, sealed filing).

The Government, in countless other Sentencing Memoranda regarding the January 6th cases, has offered nine (9) salient, non-exhaustive factors relevant to disparate recommendations and sentences, to include: (1) whether, when, and how the defendant entered the Capitol building; (2) whether the defendant engaged in any violence or incited violence; (3) whether the defendant engaged in any acts of destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. *See, for example, United States v. Eliel Rosa*, 1:21-cr-00068 (TNM).

[Type here]

The table below is offered to apply these factors to the case of Mr. McAuliffe.

| Government's Factor | Mr. McAuliffe's Conduct |
|---|---|
| Whether, when, and how the defendant entered the Capitol building | At 3 pm, Mr. McAuliffe walked through an open Capitol door, following others. He scaled no walls or scaffolding and didn't push anyone. |
| Whether the defendant engaged in any violence or incited violence | Mr. McAuliffe did not engage in any acts of violence and did not incite any violence or even yell at anyone. |
| Whether the defendant engaged in any acts of destruction | Mr. McAuliffe did not engage in any acts of destruction, rather, he replaced a picture to the wall that had been moved to the floor. |
| The defendant's reaction to acts of violence or destruction | Mr. McAuliffe did not become aware of the full level of violence or destruction until he later saw and heard about it on the news. |
| Whether during or after the riot, the defendant destroyed evidence | Mr. McAuliffe destroyed no evidence at any time, during or after the events of January 6th. |
| The length of the defendant's time inside the building, and exactly where the defendant traveled | Mr. McAuliffe proceeded only 30 feet into the building, where he sat down in a chair for a half hour after being on his feet for 11 hours and made no effort to go anywhere else in the building. |
| The defendant's statements in person or on social media | At the end of that exhausting day, and before seeing the news, Mr. McAuliffe posted that he was "feeling blessed" and "You're welcome" on Facebook. He took his page down and for the past year has never expressed anything other than shame and remorse. He has used social media exclusively for business for his involvement. Unlike other defendants, he refused media interviews. |

| Whether the defendant cooperated with, or ignored, law enforcement | Mr. McAuliffe did not ignore law enforcement. He cooperated fully with law enforcement, turning over his cellphone immediately, consenting to its search, and providing its PIN number. He was also interviewed by the Government and was truthful in all aspects. |
|---|---|
| Whether the defendant otherwise exhibited evidence of remorse of contrition | Mr. McAuliffe expressed an immediate interest in accepting responsibility by pleading guilty and has expressed sincere remorse in conversations with friends and colleagues, as well as his letter to Probation intended for this Court. |

The facts of this matter and this Defendant are similar to *United States v. Morgan-Lloyd*, 1:21-cr-00164. There, as here, we have a Defendant who did not engage in any preplanning or coordination prior to her entry into the Capitol. There, as here, we have a Defendant who did not personally engage in acts of violence or destruction of property or incite the same. There, as here, we have a Defendant who only remained in the Capitol for a brief period of time and in a limited area of the building. There, as here, we have a Defendant who cooperated with law enforcement at the time of arrest. There, as here, we have a Defendant who timely admitted to her actions and accepted responsibility, although it should be noted that unlike Mr. McAuliffe, Ms. Morgan-Lloyd bragged about the event using the phrase "We stormed the capital building" later that day and then even the following day, January 7, 2021, Ms. Morgan-Lloyd expressed that "That was the most exciting day of my life" in a Facebook comment and said "I'm so glad we were there." Government Sentencing Memorandum at ¶¶ 13-14 (Document 25). Nonetheless, Ms. Morgan-Lloyd was sentenced to probation and agreed-to restitution of $500 but no home confinement.

[Type here]

Another case for comparison is *United States v. Danielle Nicole Doyle*, 1:21-cr-00324 (TNM). There, as here, we have a Defendant who did not engage in any preplanning or coordination prior to her entry into the Capitol. There, as here, we have a Defendant who did not personally engage in acts of violence or destruction of property or incite the same. There, as here, we have a Defendant who only remained in the Capitol for a briefly and in a limited area of the building. There, as here, we have a Defendant who cooperated with law enforcement at the time of arrest. There, as here, we have a Defendant who timely admitted to her actions and accepted responsibility. However, as set forth in the Government's Sentencing Memorandum (Document 27) at page 2-3, unlike Mr. McAuliffe, Ms. Doyle entered "by climbing through a broken window" and "witnessed individuals climbing statues and the scaffolding on the west front of the building, and she saw the torn fabric on the exterior of the scaffolding." Further, she "walked upstairs and entered the Rotunda" and ultimately "entered the Statutory Hall Connector" where she "appears to chant or yell in the director" of a law enforcement officer. Based on all the facts, the Government recommended probation with two months home confinement and community service. Ms. Doyle was sentenced to probation of only two months without any home confinement, a $3,000 fine and $500 restitution.

Another case for comparison is *United States v. Thomas Gallagher,* 1:21-cr-00041 (CJN). There, as here, we have a Defendant who did not engage in any preplanning or coordination prior to his entry into the Capitol. There, as here, we have a Defendant who did not personally engage in acts of violence or destruction of property or incite the same. There, as here, we have a Defendant who only remained in the Capitol for a brief period of time, although Mr. Gallagher was arrested inside the building so it is unknown how long he might have otherwise remained. There, as here, we have a Defendant who cooperated with law enforcement at the time of arrest. There, as here,

we have a Defendant who timely admitted to his actions and accepted responsibility. Based on all the facts, the Government recommended probation with one month home confinement and community service. Mr. Gallagher was sentenced to probation of 24 months without any home confinement, 60 hours of community service and $500 restitution.

The Government has cited entry through an open door into a Senate conference room some 30 feet from the entry doors as an aggravating factor. The Defense concedes that it is a relevant factor to consider but urges that Mr. McAuliffe's presence inside was in no way connected to any malicious intent, nor does the Government even suggest any. Mr. McAuliffe deeply regrets both entering the building itself and the conference room.

It is important for the Court to know that two other defendants who went inside the very same conference room as Mr. McAuliffe have been sentenced.  It is submitted that their cases are highly instructive to the instant case on this point.

First is the case of Gary Edwards (*United States v. Edwards,* 21-cr-366 (JEB)), who entered the same conference room as Mr. McAuliffe. The Government recommended the same 14 day sentence as they are for Mr. McAuliffe. However, Mr. Edwards instead received a 12-month probationary sentence.

Second is the case of Felipe Marquez (*United States v. Marquez,* 21-cr-136 (RC)).  There, as here, the Government recommended incarceration, although in that case the recommendation was four (4) months' incarceration, not 14 days – clearly, the Government viewed the conduct of Mr. Marquez as more serious than Mr. McAuliffe's. Mr. Marquez drove to Washington from Florida with a handgun in his car (although he apparently did not remove it while in Washington), remained in the Capitol for some 53 minutes, and interfered with Capitol Police officers while inside. However, he received a sentence of 18 months' probation with three months' home

detention, and no incarceration. Judge Contreras explained that Marquez's documented mental-health issues had a "significant influence" on his sentence and believed that probation would best allow Marquez to receive mental-health treatment. *Marquez,* Tr. 12/10/21 at 32, 34, 37. It is submitted that the same applies to Mr. McAuliffe, only more so, and Counsel respectfully directs this Court to the sealing filing submitted in connection with this memorandum. If Mr. Marquez received probation and home detention despite a four-month incarceration recommendation, it is urged that Mr. McAuliffe should also receive a sentence of probation and home detention based on the same dispositive factor.

The various cases similar to Mr. McAuliffe's have not resulted in incarceration. The issue seems to be the length of the probationary term, whether there is a home confinement or detention component, and whether there is community service or an alternative fine. It is respectfully suggested that a term of probation with home detention, along with a fine and restitution is on par with other cases.

Given the enormous strides that he has made this past year in re-building his career and marriage, to incarcerate him, even for a short time, will do great damage to his business and his family. To incarcerate him at this point would take things backwards, throwing the marriage he has worked so hard to rebuild this past year back into turmoil. Truly, Mr. McAuliffe "gets it" and a sentence of incarceration is not needed to drive the point home.

A non-custodial sentence, especially while he is serving as a "Mr. Mom" to two young children, will allow Mr. McAuliffe to continue on his path to rebuilding his marriage, taking care of his family (as a single parent for the next five months), continuing to build his business, and moving forwards toward personal redemption and growth.

[Type here]

**V.      Conclusion**

For all these reasons, Mr. McAuliffe respectfully asks this Court to impose a non-incarceration sentence in this matter and to order a sentence of restitution and probation, home detention, continued mental health counseling, community service of whatever volume the Court sees fit, and a fine in the Court's discretion, as a just, fair, and reasonable resolution of this matter.


Dated: _____, 2022                          Respectfully submitted,


                                                      S/ Richard D. Collins
                                                      Richard D. Collins
                                                      Collins, McDonald & Gann, PC
                                                      138 Mineola Blvd.
                                                      Mineola, New York 11501
                                                      (516) 294-0300 Telephone
                                                      Attorney for Justin McAuliffe


**CERTIFICATE OF SERVICE**

I certify that I have served a copy of the foregoing upon Counsel for the United States with the foregoing by filing same in the Court's CM/ECF system, this

_____ of January, 2022.

/s/ Richard D. Collins


[Type here]