## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00608-RCL** |
| **v.** | : | |
| | : | |
| **JUSTIN MCAULIFFE,** | : | |
| | : | |
| **Defendant.** | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Justin McAuliffe ("McAuliffe") to 14 days incarceration, three years' probation, and $500 in restitution.

**I.      A Sentence Imposed for a Violation of 40 U.S.C. § 5104(e)(2)(G) May Include Both Incarceration and Probation**

Under 18 U.S.C. § 3561, a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3). Section 3561(a)(3) thus states the general rule that "imposition of both probation and straight imprisonment" in the same sentencing hearing is not permitted. *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999); *see United States v. Harris*, 611 F. App'x 480, 481 (9th Cir. 2015); *United States v. Anderson,* 787 F. Supp. 537, 539 (D. Md. 1992).

This general prohibition against sentences that combine continuous incarceration and probation does not apply, however, where the defendant is sentenced for a petty offense. *See* 18 U.S.C. § 3561(a)(3); *United States v. Posley*, 351 F. App'x 801, 809 (4th Cir. 2009). In *Posley*,

the defendant, convicted of a petty offense, was sentenced to two years of probation with the first six months in prison. *Posley*, 351 F. App'x at 808. In affirming that sentence, the Fourth Circuit concluded that Section 3651(a)(3) "[u]nquestionably" provided statutory authority to sentence the petty-offense defendant to "a term of six months of continuous imprisonment plus probation." *Id.* at 809. Permitting a combined sentence of continuous incarceration and probation for petty offenses is sensible because sentencing courts cannot impose supervised release on petty-offense defendants. See 18 U.S.C. § 3583(b)(3); *United States v. Jourdain*, 26 F.3d 127, 1994 WL 209914, at *1 (8th Cir. 1994) (unpublished) (plain error to impose a term of supervised release for a petty offense). It follows that a sentencing court may impose a combined sentence of incarceration and probation where, as here, the defendant is convicted of a petty offense.

On Friday January 7, 2022, Judge Colleen Kollar-Kotelly sentenced a Capitol breach defendant convicted under 40 U.S.C. § 5104(e)(2)(G) to "the custody of the Bureau of Prisons for a term of 90 days" followed by a term of "36 months of probation." *See United States v. Virginia Marie Spencer*, Criminal Docket No 1:21-cr-00147-CKK-2, trans. 46:25.

However, on January 19, 2022, Judge Kollar-Kotelly reversed this sentence and imposed only a term of incarceration. *Id.* at Docket No. 70. She noted in that opinion,

> [A] plain reading of the statutory sections at issue – 3551(b) and 3561– leads to the conclusion that a district court must choose between probation and imprisonment when imposing a sentence for a petty offense. This Court is unpersuaded by the contrary holding in *Posley*, a case cited by the Government, as it neither considers Section 3551 nor is it binding precedent. *Id*.

Additionally, on January 19, 2022, Judge Thomas F. Hogan sentenced a Capitol breach defendant named Jacob Kyle Wiedrich, ECF Docket No. 1:21-cr-581.  In that hearing, Judge Hogan specifically held there was insufficient statutory authority to impose a split sentence.

## II.      Introduction

The defendant participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than one million dollars' of property damage.

McAuliffe pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building.   As explained herein, the government's recommended sentence is appropriate in this case because: (1) McAuliffe entered the Capitol building; (2) he entered, sat down, and rested in Senator Jeff Merkley's conference room for about half an hour and remained there while others smoked marijuana in the conference room; and (3) he posted pictures he took on January 6th on social media along with boastful comments.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed to substantially delay the certification vote. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan). Here, the defendant's participation in a riot that actually succeeded in halting the Congressional certification combined with the defendant's behavior renders the recommended sentence appropriate in this case.

### III.     Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to the defendant's conduct and behavior on January 6.

*Justin McAuliffe's Role in the January 6, 2021 Attack on the Capitol*

Justin McAuliffe traveled with friends to Washington D.C. on January 5, 2021, to participate in the political rally in support of President Trump, which was scheduled for the following day. On January 6, 2021, McAuliffe left his hotel at approximately 3:00 a.m. to attend the rally. That day he wore a dark jacket, jeans, and a knitted red, white, and blue cap including "Trump" in large white letters.

After the rally, McAuliffe made his way with a crowd to the Capitol. Upon arriving at the Capitol grounds, he began recording videos on his telephone. McAuliffe made his way toward the building and described the scene as chaotic.  Specifically, he stated he did "see some mild violence of people trying to rush the police officers, where they were promptly tear gassed or restrained." PSR at paragraph 45.  He also explained he witnessed police stopping people from going to certain areas of the Capitol grounds including inside the building.  *Id.* at 46.  He also explained that he saw "a broken window, and some debris on the ground."  *Id*. at 47.

CCTV cameras facing the Senate Wing doors captured McAuliffe enter the Capitol building through the doors at around 3:09pm.  The first breaches of the Capitol by others were

about an hour before.  By the time McAuliffe entered, officers were lined against the back wall and not physically trying to stop people from entering.



McAuliffe can be seen filming the events on his phone and casually walking through the crowd. The government has uncovered no evidence that he damaged anything, confronted any law enforcement officers, or behaved violently in any way.

McAuliffe made his way about 30 feet down the hallway, saw an open door on his left, and entered room "S140."  This room was not labeled as dedicated space for Senator Merkley.  Another defendant captured McAuliffe's entrance into this room, which is a conference room used by Senator Jeffrey Merkley from the state of Oregon.  This room is also known as a hideaway office, and items in the room (decorations) suggest it was a personalized space.



Shortly after entering this room, McAuliffe sat down to rest for approximately 30 minutes.  McAuliffe continued to rest until officers entered and instructed everyone to leave the room.  He immediately complied with instructions from officers and left the building.



Before McAuliffe entered this room, a number of rioters had entered and exited, sat at the senator's conference table, used the conference room telephone, smoked, yelled, and banged on the table.  The Government's Sentencing Memorandum in *United States v. Felipe Marquez*, 21-cr-136 (RC), ECF No. 28 at 8, describes how defendant Felipe Marquez entered this room at around 3:00 p.m., filmed other rioters smoking in the room, and himself smoked from a vape pen. Defendant Brandon Fellows also described how "I walked in there's just a bunch of people lighting up in some Oregon room…they were smoking a bunch of weed in there." Affidavit in Support of Criminal Complaint and Arrest Warrant, *United States v. Brandon Fellows*, No. 21-

cr-83 (TNM), ECF No. 1 at ¶ 15. Again, this was before McAuliffe entered the room.



At 11:36 p.m. on January 6, Senator Merkley posted a three-minute-long video to Twitter https://twitter.com/SenJeffMerkley/status/1347039504528498688. Senator Merkley explained that rioters appear to have "smashed the door virtually off its hinges," even though the door was unlocked. He said that the rioters "left a Trump flag here to mark their presence." The senator narrated how the rioters "stole the laptop that was sitting on the table," and panned across his conference table to show the damage and disarray. He then zoomed in on ashes on a table to discuss how the rioters appear to have been "smoking something." Senator Merkley then stated, "count this office trashed."

Another defendant captured McAuliffe's exit. He calmly walked out of the building while recording the events:





*FBI Interview*

McAuliffe was arrested on January 28, 2021.  He voluntarily submitted to an interview

with the FBI and the US Attorney's Office on August 5, 2021.  During that interview, he stated

that his intent in going to D.C. was to peacefully show his support for President Trump. He

stated he had no intention of going to the Capitol. He indicated that his mindset at the time was

to record on his cell phone as much as possible of what was happening. McAuliffe did not

understand the extent and scope of the violence at the Capitol until he was driving home and

listening to the news.  McAuliffe was fully cooperative with the FBI, voluntarily provided his

cell phone, and answered all questions.  He was forthright, accurate, and remorseful.

When he provided his cell phone, Mr. McAuliffe signed a consent to search, provided his

PIN, and did not appear to withhold any evidence from investigators.

*Social Media Posts*

Shortly after the attack on the Capitol, McAuliffe used Facebook to post the following:



McAuliffe removed this post after receiving significant backlash from his followers.

*The Charges and Plea Agreement*

On January 20, 2021, McAuliffe was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2). He has been on pretrial release and compliant with that release since the end of January 2021. On September 30, 2021, McAuliffe was charged by a one-count Information with 40 U.S.C. § 5104(e)(2)(G). On November 23, 2021, he pleaded guilty to the Information. By plea agreement, McAuliffe agreed to pay $500 in restitution to the Architect of the U.S. Capitol.

### IV.    Statutory Penalties

The defendant now faces a sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000. The defendant must also pay restitution under the terms of his or her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### V.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, all of the Section 3553(a) factors weigh in favor of incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms.  It was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while looking at the defendant's individual conduct, the Court must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had the defendant personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on the part of the defendant is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish the defendant from most other misdemeanor defendants.  The defendant's lack of violence and property destruction explains why he was charged only with, and permitted to plead guilty to, a misdemeanor rather than a felony.

On January 6th, McAuliffe trespassed onto the Capitol grounds and Capitol building through the Senate Wing doors.  McAuliffe spent approximately 30 minutes inside the building but only traveled about 30 feet inside the doors and then sat in a senator's private conference room. He engaged in no violence or destruction, but not all the harm McAuliffe caused was abstract: approximately eight hours later, Senator Merkley took a break from the certification to document the damage that rioters had caused in his space, including the remnants of smoking.  Even if McAuliffe himself was not the individual directly responsible for the scroll ripped from the wall, or the debris strewn across the floor, his actions in Senator Merkley's conference room contributed to a lawless atmosphere there.  McAuliffe's baseline conduct, entering the Capitol, is serious: the riot could not have succeeded without the efforts of even more minor contributors like McAuliffe. On top of that, McAuliffe's social media post ("You're welcome") indicates a belief that he had accomplished something worthy of his followers' gratitude.

McAuliffe fully cooperated with the FBI when they approached him and has consistently expressed remorse and contrition for his actions that day. Accordingly, the nature and the circumstances of this offense support the government's sentencing recommendation.

### B.  The History and Characteristics of the Defendant

As set forth in the PSR, McAuliffe has no criminal history.  He has been compliant with

his conditions of pre-trial release in this case and cooperative with the FBI and the U.S. Attorney's Office.

At the end of March 2021, defense counsel sent counsel for the United States approximately 25 letters of support of the defendant. Counsel for the United States personally called almost all of the authors of these letters. To a person, each individual confirmed that they provided the letter of support for Justin McAuliffe knowing that it was to be submitted as part of this criminal case. To a person, each individual amplified what they had written, reiterating that Justin McAuliffe is an exceptional, kind, caring, wonderful, and professional person. Many of them discussed how McAuliffe shared with them his extreme remorse for his involvement in the Capitol breach. These letters of support are legitimate and sincere.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[1] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

---

[1] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. The violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—

especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

McAuliffe has demonstrated over the last year that he is done with this type of activity. He has repeatedly demonstrated in interviews and through cooperation that he is genuinely remorseful and is devastated that he had anything to do with the riot. The United States does not believe that McAuliffe needs to be specifically deterred in the future. A term of probation is appropriate to ensure McAuliffe's continued sobriety and recovery.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[2] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not become the default.[3] *See United States v. Anna Morgan-Lloyd*,

---

[2]  Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities. *See, e.g.*, *United States v. Hatley*, 1:21-cr-98 (TFH), Tr. 12/16/21 at 3 ("it's a good guideline for the Court to understand the variety of sentences that have been given [referencing the government's sentencing chart]") (statement of Judge Hogan).

[3]  Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-

1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lambeth.

The government and the sentencing courts have made meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long she remained inside, the nature of any statements she made (on social media or otherwise), whether she destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences.  And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement.  *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

---

00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

Sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, other judges of this court have sentenced Capitol breach defendants who spent time in other sensitive places within the Capitol. A defendant's entry into a sensitive space, such as the Senate Floor or a member's office, places that defendant in a more serious category of offenders than defendants who remained in hallways or central, more public spaces, such as the Rotunda. A defendant who entered a sensitive space took an extra step to occupy the Capitol and displace Congress and to display the dominance of the mob over the will of the people. An unauthorized individual in a private space poses a greater threat and creates a greater impediment to members of Congress and staffers trying to do their jobs than would a trespasser passing through a hallway.

One of the most famous photographs from January 6 is that of a rioter in Speaker Pelosi's office, with his feet on her desk. *See* Amended Complaint, *United States v. Richard Barnett,* 21-cr-38, ECF No. 3, at 2.  That photograph has become notorious likely for exactly this reason,

because of what invading the office of a member of Congress represents: a show of intimidation, an attempted display of power, above and beyond entering the building. As noted above, while Senator Merkley's conference room was not labeled as such, it was clearly recognizable as a private space, and thus implicates similar concerns. Another rioter, Brandon Fellows, recognized it as some sort of "Oregon room." Affidavit, *Fellows, supra*, ECF No. 1 at ¶ 15.

In *United States v. Derek Jancart and Erik Rau*, 21-cr-148 (JEB) and 21-cr-467 (JEB), the defendants pled guilty to misdemeanor charges of 40 U.S.C. § 5104(e)(2)(D) (disorderly conduct in the Capitol building) in connection with penetrating the Capitol building all the way to the Speaker's Conference Room. Judge Boasberg sentenced the defendants each to 45 days of incarceration. A misdemeanant who reached the Senate Floor, even though she does not appear to have known where she was, also received a sentence of incarceration. *United States v. Courtright,* No. 21-cr-72 (CRC) (30 days incarceration, one year supervised release).

The government acknowledges that Felipe Marquez, who also entered Senator Merkley's space, received a sentence of three months' home detention; the government had recommended four months' incarceration. *United States v. Marquez,* 21-cr-136 (RC). Judge Contreras, however, explained that Marquez's documented mental-health issues had a "significant influence" on his sentence, and believed that probation would best allow Marquez to receive mental-health treatment. *Marquez,* Tr. 12/10/21 at 32, 34, 37.

Another defendant, Gary Edwards, who entered Senator Merkley's room also received a 12-month probationary sentence from Judge Boasberg. The United States likewise requested a sentence of 14 days. Edwards was a 68-year-old retiree with no criminal record who was there for less than a minute, and there was no evidence that he engaged in any flagrant conduct while there. *See United States v. Edwards,* 21-cr-366 (JEB).

James Bonet is another defendant who entered Senator Merkley's room. *See United States v. James Bonet*, 1:21-cr-121.  He has yet to be sentenced in that case; however, the United States recommended 45 days' incarceration in that case.  Defendant Bonet posted a video calling police "pieces of shit," witnessed a rioter fight with police, watched a woman being carried away on a stretcher, breached the Capitol and filmed himself smoking a joint inside Senator Merkley's space.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## VI.   Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence McAuliffe to 14-days incarceration, three years' probation, and $500 in restitution. Such a sentence protects

the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility.

Respectfully submitted,

MATTHEW GRAVES
UNITED STATES ATTORNEY

By: _____

JACOB J. STRAIN
Utah Bar No. 12680
Assistant United States Attorney
U.S. Attorney's Office for the District of Columbia
555 4th Street, N.W.
Washington, D.C. 20530